IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

MICHAEL E. LECHLITER

:
:
: Criminal Case No. DKC 13-0715
:
:

**MEMORANDUM OPINION**

Pending before the court is the government's interlocutory appeal from an order issued November 18, 2013, by United States Magistrate Judge Thomas M. DiGirolamo, granting a motion to suppress filed by Appellee Michael E. Lechliter. The relevant issues have been briefed and the parties presented oral argument at a hearing on February 14, 2014. For the reasons that follow, the suppression order will be reversed and the case remanded for further proceedings.

## I. Background

Following a minor traffic accident on the evening of June 23, 2012, Appellee was arrested by United States Park Police and charged, *inter alia*, with driving under the influence of alcohol, in violation of 36 C.F.R. § 4.23(a)(1). On June 3, 2013, he filed a motion to suppress evidence of a nonconsensual, warrantless blood test incident to his arrest based on *Missouri v. McNeely*, --- U.S. ----, 133 S.Ct. 1552 (2013), in which the

Supreme Court of the United States held that the natural dissipation of alcohol in the bloodstream does not, by itself, constitute an exigent circumstance justifying a warrantless blood draw.[1]

On July 17, 2013, Judge DiGirolamo issued an order in seventeen pending cases, including the case from which the instant appeal arises, finding that *McNeely* applied retroactively. Subsequently, he ruled on a suppression motion in *United States v. Brown*, No. 13-po-01557, 2013 WL 5604589 (D.Md. Oct. 11, 2013), based on facts substantially similar to those presented here, that warrantless blood testing constituted

---

[1] *McNeely* reaffirmed the rule of *Schmerber v. California*, 384 U.S. 757, 758 (1966), that courts must "engage in a totality of the circumstances analysis when determining whether exigency permits a nonconsensual, warrantless blood draw." *McNeely*, 133 S.Ct. at 1557 (internal marks and citation omitted). In *Schmerber*, the Supreme Court upheld the admission into evidence of the results of a nonconsensual, warrantless blood test of an individual who was involved in a traffic accident and suspected of driving under the influence of alcohol. The Court found that, although the Fourth Amendment generally protects against such intrusions absent a warrant, the arresting officer in that case "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence[.]" *Schmerber*, 384 U.S. at 770 (internal marks and citation omitted). Considering the "special facts" of the case – specifically, that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops" and that "time had to be taken to bring the accused to the hospital and to investigate the scene of the accident" – the Court "conclude[d] that the attempt to secure evidence of blood-alcohol content . . . was an appropriate incident to [the] petitioner's arrest." *Id*. at 770-71.

a violation of the defendant's rights under the Fourth Amendment and that the good faith exception to the exclusionary rule did not apply. A hearing on Appellee's motion to suppress was scheduled for November 18, 2013.

At the suppression hearing, United States Park Police Officer Greg Harper testified that, at 10:39 p.m. on June 23, 2012, he received a dispatch report of "a two vehicle crash on the Clara Barton Parkway," a federal highway in Montgomery County, Maryland, that is "administered by the National Park Service." (ECF No. 1-20, at 5, 39). He arrived at the scene within minutes, observing that officers from the Montgomery County Police Department were already present and that two cars that appeared to have been involved in a minor "fender bender" were parked "off to the safety portion of the road." (*Id*. at 6). Officer Harper "asked for both drivers" and met first with Appellee, immediately observing indicia of impairment: Appellee "was swaying[,] . . . his zipper was down[,] . . . his speech was slurred[,] . . . his eyes were real watery and bloodshot[, and he] . . . smelled of alcohol." (*Id*. at 6-7). Officer Harper administered three field sobriety tests, which he estimated took "approximately 10 minutes" to complete, and concluded afterward that Appellee was under the influence of alcohol. (*Id*. at 7). At approximately 11:00 p.m., Appellee was placed under arrest and seated in the front passenger seat of

Officer Harper's police cruiser. (*Id*. at 15). When the officer advised him that he would be taken "back to the station for . . . two breath samples," Appellee "said he absolutely would not do that," which prompted Officer Harper to call for "permission from [his] supervisor for a blood draw." (*Id*. at 11). In accordance with U.S. Park Police policy, he called for a tow truck to impound Appellee's vehicle and "started doing the tickets" while he waited for it to arrive. (*Id*. at 12, 17).

In the interim, Appellee's mother arrived at the scene in a different vehicle. While speaking with her, Officer Harper "noticed that she smelled of alcohol . . . [and] informed her that [he] needed her to do a field sobriety [test]." (*Id*. at 15). Appellee overheard this and "went crazy[,] . . . yelling, 'Don't do anything they say. F them. Don't listen to them.'" (*Id*.). Officer Harper rolled up the window of the police cruiser and "called for another officer to assist [him.]" (*Id*. at 16). He administered a roadside breath test to Appellee's mother, who "blew a 0.04." (*Id*.). Officer Harper "told her that [he] was just going to have her wait . . . until the crane [arrived] and if she goes below . . . a 0.03, then [he] would just let her go home." (*Id*. at 17).

Approximately thirty minutes later, Officer Harper's partner and the tow truck both arrived; Appellee's mother was permitted to leave in her car; and Appellee was transported to

Sibley Hospital where his blood was drawn, without his consent, at 11:39 p.m. (*Id.* at 18, 35-36). When asked why he did not "call a magistrate or judge and obtain a warrant for the blood draw," Officer Harper responded, "I didn't know we had to. . . . Under [36 C.F.R. § 4.23(c)(3)] . . . we had the right to choose blood, urine or breath." (*Id.* at 19).[2] He added that he had "never" sought "a warrant for a blood test" in the past and that he was unaware of any procedure for obtaining a warrant "in the middle of the night[.]" (*Id.*). He further testified that, after the Supreme Court's ruling in *McNeely*, the United States Park Police immediately established an expedited warrant procedure. (*Id.* at 19-20).

Based on this testimony, the government argued that additional factors other than the natural dissipation of alcohol in the bloodstream created exigent circumstances justifying the warrantless blood draw and that, in any event, the results of the blood test should not be excluded because Officer Harper acted in accordance with the law in effect at the time of the arrest. Judge DiGirolamo was not persuaded:

> As I see this case, the exigency – let me
> say the special fact that I see in this

---

[2] Pursuant to this provision, "[a]ny test or tests for the presence of alcohol and drugs shall be determined by and administered at the direction of an authorized person." The term "authorized person" is defined as "an employee or agent of the National Park Service with delegated authority to enforce the provisions of this chapter." 36 C.F.R. § 1.4(a).

case[,] using the term from [*Schmerber*] would be there is an accident here.

There was an accident in [*Schmerber*] and in that case . . . time had to be taken to investigate the accident. I think time had to be taken also in that case – if I recall there were personal injuries as well but I may be wrong on that.

And that is why I was asking the officer . . . how much time did it take to invest[igate] the accident itself? You know, and he – he did talk to the other driver and said that was about 10 minutes or so. But my impression is the fact that there was an accident here did not really delay the proceedings of the entire evening.

After the call for the tow truck, that is going to happen whether or not there is an accident. And that is as the officer stated. So everything that happened with the defendant's mother is happening while they are waiting for the tow truck and that did not cause a delay in any of the proceedings because they were going to have to wait for the tow truck anyway.

. . . [A]lthough like [*Schmerber*] there is an accident in this case, the fact that there was an accident in my opinion did not delay to any significant extent the proceedings that night or the course of conduct that night.

So I don't find that there are exigent circumstances here. And for the same reasons that I set out in the [*Brown*] opinion, I appreciate that there was no procedure or no[] expedited warrant procedure in effect at that time, and I appreciate that no one really thought you even had to get a warrant at that time.

But that is the same thing that [the] [o]fficer [in *McNeely*] faced. He didn't

think he had to get a warrant at that time
either.  So I am not going to reiterate
that.  I think I s[et] all of that out in my
[*Brown*] opinion.  I am going to reaffirm my
decision there on the good faith [exception]
to the exclusionary rule there.

So on that basis, I am making a finding
that there was no consent.  I am making a
finding that there [were] no exigent
circumstances.  I don't find that this is
the case to apply the good faith [exception]
to the exclusionary rule.  So therefore, I
am going to grant the motion to suppress in
this case.

(*Id.* at 54-55).

On December 2, 2013, the government timely filed a notice
of appeal.  (ECF No. 1).  The government's appellate brief
followed on January 10, 2014 (ECF No. 6), and Appellee filed a
brief in opposition on February 10 (ECF No. 9).  The parties
presented oral argument at a hearing on February 14.

## II.  Standard of Review

Federal Rule of Criminal Procedure 58(g)(2)(A) permits
"[e]ither party" to take an interlocutory appeal from "an order
of a magistrate judge to a district judge within 14 days of its
entry if a district judge's order could similarly be appealed."
Pursuant to 18 U.S.C. § 3731, "[a]n appeal by the United States
shall lie to a court of appeals from a decision or order of a
district court suppressing or excluding evidence . . . if the
United States attorney certifies to the district court that the
appeal is not taken for purpose of delay and that the evidence

is a substantial proof of a fact material in the proceeding." The government has filed the requisite certification in this case. (ECF No. 5).

Rule 58(g)(2)(D) provides that the scope of an appeal from a magistrate judge's order "is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Thus, "in reviewing the grant of a suppression motion, [the district court] review[s] the [magistrate judge's] factual findings for clear error and [his] legal determinations de novo." *United States v. Laudermilt*, 677 F.3d 605, 609 (4th Cir. 2012) (citing *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010)).

### III. Analysis

The government challenges the ruling below essentially on two fronts. Taken in the proper order, it argues first that a warrant was not necessary because exigent circumstances, other than the natural dissipation of alcohol in the bloodstream, were presented in this case such that it was reasonable for Officer Harper to believe there was insufficient time to obtain a warrant. Secondly, and more forcefully, the government contends that, even if a warrant was required, the court erred in finding that the good faith exception to the exclusionary rule did not apply because the law in this district at the time of Appellee's

arrest did not require a warrant. Both of these arguments have merit.

Judge DiGirolamo's decision to suppress the results of Appellee's blood test was based largely on his finding that the facts were materially indistinguishable from those presented in *Brown* – in other words, that the accident in this case, the complications presented by Appellee's mother arriving on the scene, and the time that the officer had to wait for a tow truck did not enhance the degree of exigency to any significant degree. As to this much, no error is discernable. Officer Harper testified unequivocally that he arrived at the scene within minutes of receiving the dispatch report; that he promptly observed indicia that Appellee was intoxicated, administered field sobriety tests, and placed him under arrest for suspicion of driving under the influence of alcohol; that departmental policy in any drunk-driving arrest required that the driver's vehicle be impounded and that an officer wait at the scene until a tow truck arrived; and that the tow truck arrived within the expected time period. Thus, Judge DiGirolamo's finding that "everything that happened . . . while they [were] waiting for the tow truck . . . did not cause a delay in any of the proceedings because they were going to have to wait for the tow truck anyway" (ECF No. 1-20, at 54), is fully supported by the record, and the case is in the same

general factual and procedural posture as *Brown*, a more "routine" DWI case not involving an accident.

The problem is that *Brown* misinterpreted *McNeely* in critical respects. Initially, *Brown* failed to recognize that, under *McNeely*, the time required to obtain a warrant, including whether an expedited warrant procedure was in place, could impact the exigency analysis. Specifically, Justice Sotomayor's opinion for the *McNeely* Court recognized:

> [T]he fact that a particular drunk-driving stop is "routine" in the sense that it does not involve "'special facts,'" *ibid*., such as the need for the police to attend to a car accident, does not mean a warrant is required. Other factors present in an ordinary traffic stop, such as the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search. The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case.

*McNeely*, 133 S.Ct. at 1568. Thus, under *McNeely*, the existing procedure for obtaining a warrant is a factor among the "totality of the circumstances" that should be considered in determining whether a warrantless search is reasonable. *Id*. at 1559.

In *Brown*, the undisputed testimony was that the United States Park Police had no expedited warrant procedure in place prior to the *McNeely* decision. The arresting officer "testified that[,] in the event of a refusal, U.S. Park Police procedures provided that the suspect could be transported to a hospital for a nonconsensual blood draw if a supervising officer first gave permission" and that "she had never obtained a warrant in the past under these circumstances[.]" *Brown*, 2013 WL 5604589, at *2. A detective "confirmed that it was not the policy of the U.S. Park Police to obtain a warrant prior to the nonconsensual taking of DWI suspect's blood," adding that "the procedure developed between the U.S. Park Police and United States Attorney's Office in regard to obtaining a search and seizure warrant during non-business hours . . . could take from five to nine hours." *Id*. at *3. Moreover, testimony established that, on April 17, 2013 – the same day *McNeely* was decided –

> Sergeant Anthony Giannino of the U.S. Park Police . . . contacted the chief United States Magistrate Judge in an effort to devise an expedited procedure to obtain warrants for blood draws. During the course of that same day, Sergeant Giannino and the chief Magistrate Judge devised such a procedure. In fact, the new procedure was first used later that same night. Since the new procedure was implemented, approximately 20 warrants for blood draws have been applied for and none have been declined.

*Brown*, 2013 WL 5604589, at *3. The fact that an expedited warrant procedure was put in place on the same day that *McNeely* was decided supports the conclusion that no such procedure existed prior to that date.

Similarly, in the instant case, Officer Harper testified that he was acting in accordance with departmental policy when he directed Appellee's nonconsensual, warrantless blood draw; that he had never sought a warrant under those circumstances in the past; that he believed the applicable law did not require him to do so; and that an expedited warrant procedure was promptly put in place after *McNeely* was decided. Moreover, Judge DiGirolamo acknowledged that "there was no . . . expedited warrant procedure in effect" at the time of Appellee's arrest and that "no one really thought" a warrant was necessary. (ECF No. 1-20, at 55).

Significantly, the same facts were not presented in *McNeely*. Although Missouri did not permit a warrant to issue based on "oral testimony, thus excluding telephonic warrants," *McNeely*, 133 S.Ct. at 1562 n. 4, the defendant "entered into evidence [at the suppression hearing] a search-warrant form used in drunk-driving cases by the prosecutor's office . . . where the arrest took place" and "[t]he arresting officer acknowledged that he had used such forms in the past and that they were 'readily available,'" *id*. at 1562 n. 5. Moreover, the officer

12

"testified that he made no effort to obtain a search warrant before conducting the blood draw even though he was 'sure' a prosecuting attorney was on call"; that "he had no reason to believe that a magistrate judge would have been unavailable"; and that "he had obtained search warrants before taking blood samples in the past without difficulty." *Id*. at 1567. As Judge DiGirolamo noted in *Brown*, the underlying opinion of the Supreme Court of Missouri reflects that the officer believed his actions were justified based on a recent change in Missouri law, but that court found that the officer's belief in this regard was erroneous, *see State v. McNeely*, 358 S.W.3d 65, 68 n. 2 (Mo. 2012), and the opinion of the United States Supreme Court contains no substantive discussion of this point.[3]

---

[3] More specifically, the Missouri Supreme Court opinion reflects that, in declining to seek a warrant despite the fact that he had previously obtained warrants under similar circumstances, the arresting officer "was influenced by an article he previously read, written by a traffic safety resource prosecutor, in 'Traffic Safety News[,]' . . . assert[ing that] officers no longer needed to obtain a warrant before requiring DWI suspects to submit to nonconsensual blood tests because of recent changes in Missouri's implied consent law." *State v. McNeely*, 358 S.W.3d at 68. The Missouri court found this article was "based on a fundamental misreading of *Schmerber*." *Id*. at 68 n. 2. In *Brown*, Judge DiGirolamo equated the arresting officer's belief that a warrant was not necessary based on 36 C.F.R. § 4.23(c) with the *McNeely* officer's mistaken belief based on the change in the Missouri law, as suggested by the article he read. This analogy is inapt because, in this district, the court, prosecutors, and police were all operating under the belief that a warrant was not necessary to obtain a nonconsensual blood draw where there was probable cause for DWI. That belief, moreover, was reasonably inferred from binding

13

Although, in the instant case, the government did not specifically argue that the length of time it would have taken to obtain a warrant under existing procedures constituted an exigent circumstance in its own right, it did argue, based on Officer Harper's testimony, that no procedure for an expedited warrant was in place at the time of Appellee's arrest. From that, it may be logically inferred that obtaining a warrant would have been a time-intensive process. Moreover, *Brown* – decided approximately one month earlier by the same magistrate judge and involving the same prosecutor – provided the backdrop for the instant suppression hearing, and the government did argue in that case that "the procedure for obtaining a search and seizure warrant in Maryland [at the time of the defendant's arrest] was cumbersome and time-consuming." (Crim. No. 13-1557-TMD, ECF No. 31, at 4). Indeed, Judge DiGirolamo incorporated aspects of the *Brown* decision wholesale in granting Appellee's motion to suppress, and the government had little reason to expect that the same arguments that were rejected in that case would be successful here.

---

precedent. *See United States v. Reid*, 929 F.2d 990, 993-95 (4th Cir. 1991) (construing *Schmerber* as supporting that the natural dissipation of alcohol in the blood stream, by itself, constituted exigent circumstances permitting a warrantless, nonconsensual breathalyzer test). In sum, there was good reason for Officer Harper to believe that the time it would take to obtain a warrant justified a warrantless blood draw - not so for the arresting officer in *McNeely*.

14

*McNeely*, 133 S.Ct. at 1568, explicitly states that the "procedures in place for obtaining a warrant or the availability of a magistrate judge" are among the factors to be considered in the exigency analysis. In *Brown* – and, by extension, in the instant case – the court failed to address that factor. Its failure in this regard constitutes an error of law, and if the case were reversed solely on this basis, further suppression proceedings would be necessary to permit consideration of all relevant factors.

Such proceedings are unnecessary, however, because the court also erred in failing to apply the so-called "good faith" exception to the exclusionary rule. As the Supreme Court explained in *Davis v. United States*, --- U.S. ----, ----, 131 S.Ct. 2419, 2426-28 (2011):

> [T]he exclusionary rule [] is a prudential doctrine, created by this Court to compel respect for the [Fourth Amendment] constitutional guaranty. Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. Our cases have thus limited the rule's operation to situations in which this purpose is thought most efficaciously served. Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted.
>
> . . . .

> . . . [T]he deterrence benefits of
> exclusion var[y] with the culpability of the
> law enforcement conduct at issue. When the
> police exhibit deliberate, reckless, or
> grossly negligent disregard for Fourth
> Amendment rights, the deterrent value of
> exclusion is strong and tends to outweigh
> the resulting costs. But when the police act
> with an objectively reasonable good-faith
> belief that their conduct is lawful, or when
> their conduct involves only simple, isolated
> negligence, deterrence rationale loses much
> of its force, and exclusion cannot pay its
> way.

(Internal marks and citations omitted).

Here, in finding that the good faith exception did not apply, Judge DiGirolamo "reaffirm[ed]" his ruling in *Brown*, 2013 WL 5604589, at *9 (ECF No. 1-20, at 55) – namely, that "the relevant facts in *McNeely* were not materially different from the facts of this case, and neither the Supreme Court of Missouri nor the Supreme Court of the United States applied the good-faith exception to save the blood test results from exclusion." The state of the law in Missouri on the issue of warrantless blood draws following DWI arrests was unsettled at the time *McNeely* was decided. While the Missouri Supreme Court opinion notes that two intermediate appellate decisions held that warrantless blood draws were permissible "in terms of a search incident to arrest," *State v. McNeely*, 358 S.W.3d 65, 72 n. 5 (Mo. 2012), the issue of whether the natural dissipation of alcohol constituted *per se* exigency under *Schmerber* was

16

apparently one of first impression in that court. As noted, moreover, the arresting officer in that case did not act in accordance with existing protocol.

The same cannot be said of the instant case. Here, the Fourth Circuit's decision in *Reid* interpreted *Schmerber* as permitting a warrantless breathalyzer test under similar circumstances:

> Society has a recognized interest in protecting its citizens from drunk drivers. Breathalyzer tests cause a lesser intrusion than blood tests. Time is of the essence when testing for alcohol in the bloodstream. The combination of these factors sets out exigent circumstances which are sufficient to require that the police be allowed to test drunk drivers without first having to obtain a warrant.

*Reid*, 929 F.2d at 994. Critically, for present purposes, the court held that the availability of "a warrant via the telephone as allowed by [then applicable] Fed.R.Crim.P. 41(c)(2) . . . does not alter the exigency of the situation":

> Rule 41(c)(2)(B) requires that the police prepare a document known as "a duplicate original warrant" before calling the magistrate judge. Rule 41(c)(2)(B) also requires that the police must read the document verbatim to the magistrate judge. The magistrate judge must enter verbatim what is read to him onto a document known as the original warrant. Rule 41(c)(2)(D) requires the magistrate judge to place under oath the police officer requesting the warrant and anyone whose testimony forms a basis of the application. Further, Rule 41(c)(2)(D) requires the magistrate judge to

> record the conversation if a voice recording
> device is available; otherwise, the
> magistrate judge must arrange for a
> stenographic or longhand verbatim record to
> be made. Obviously, compliance with these
> rules takes time. Time is what is lacking in
> these circumstances[.]

*Id.* at 993.[4] Thus, the court determined that requiring an officer to obtain a warrant, even *via* the telephonic procedure set forth in then-Rule 41(c)(2), would result in the loss of critical time and, consequently, the loss of key evidence. In the instant case, Officer Harper could rely on this binding precedent that the availability of a telephonic procedure did not, by itself, overcome the exigency of the circumstances.

Although the facts of *Reid* involved a breath test, and not a blood test, other courts have interpreted the holding more generally. *See United States v. Sauls*, 981 F.Supp. 909, 913 (D.Md. 1997) (citing *Schmerber* and *Reid* for the proposition that "an individual may be compelled to take a chemical test so long as there are reasonable grounds to believe that the person was driving a motor vehicle while under the influence of alcohol or drugs"). In fact, two of the state supreme court decisions explicitly abrogated by *McNeely* cited *Reid* in finding that the natural dissipation of alcohol in the bloodstream constituted

---

[4] Rule 41 has been amended and/or re-codified since the time *Reid* was decided, but the procedure for obtaining a warrant by telephonic means has not been altered in any material respect. *See* Fed.R.Crim.P. 4.1.

*per se* exigency under *Schmerber*. *See State v. Shriner*, 751 N.W.2d 538, 547 n. 11 (Minn. 2008) (citing *Reid* among a number of cases in which "courts have interpreted *Schmerber* as concluding that the naturally rapid dissipation of alcohol in the bloodstream creates an emergency that justifies a warrantless blood draw"); *State v. Bohling*, 494 N.W.2d 399, 404 (Wis. 1993) (citing *Reid*, noting that "[t]he Fourth Circuit also concurs with our interpretation of *Schmerber*"). Although *McNeely* established, at least, that these interpretations are erroneous, there can be little doubt that the United States Park Police, the United States Attorney's Office, and likely the court itself reasonably believed this was the state of the law in this jurisdiction at the time of Appellee's arrest.

This is not a case, like *McNeely*, involving an arresting officer acting in accordance with his independent interpretation of the law based on his reading of an article and despite his knowledge that an established procedure existed for obtaining a warrant in the same circumstances. Rather, the unrebutted testimony at Appellee's suppression hearing showed that no expedited warrant procedure was in place; that the prevailing belief was that a warrant was not required; and that Officer Harper acted in accordance with what he believed to be the proper procedure. Indeed, following *McNeely*, courts in the Fourth Circuit were in much the same position as courts in

19

Wisconsin, based on the Supreme Court's explicit abrogation of *Bohling*. Notably, one intermediate appellate court there has since found the good faith exception applicable where the arresting officer compelled a warrantless blood test based on *Bohling*:

> [T]he police officer here was following the "clear and settled precedent" when he obtained a blood draw of Reese without a warrant. The deterrent effect on officer misconduct, which our supreme court characterized as "the most important factor" in determining whether to apply the good faith exception, would . . . be nonexistent in this case because the officer did not and could not have known at the time that he was violating the Fourth Amendment. At the time of the blood draw the officer was following clear, well-settled precedent established by the Wisconsin Supreme Court, which the court has stated "is exactly what officers *should do*." Accordingly, because the officer reasonably relied on clear and settled Wisconsin Supreme Court precedent in obtaining the warrantless blood draw and because exclusion in this case would have no deterrent effect, we conclude that the blood draw evidence should not be suppressed.

*State v. Reese*, No. 2012AP2114-CR, 2014 WL 642066, at ¶ 22 (Wis.App. Feb. 20, 2014) (internal citation omitted; emphasis in original). A similar result should have obtained in this case.

## IV. Conclusion

For the foregoing reasons, Judge DiGirolamo's order granting Appellee's motion to suppress will be reversed and the

case will be remanded for further proceedings.  A separate order
will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge